IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Eboni Charreen McCray, | ) | C/A No.: 1:13-173-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Mary G. Lewis's February 26, 2013, order referring this matter for disposition. [Entry #19]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.      Relevant Background

A.      Procedural History

On July 27, 2006, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on August 15, 2005. Tr. at 353–55, 358–64. Her applications were denied initially and upon reconsideration. Tr. at 184–88, 192–95. On October 15, 2008, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Francis F. Talbot. Tr. at 47–62. (Hr'g Tr.). During that hearing, Plaintiff's attorney made a motion on the record to amend Plaintiff's alleged onset date of disability to March 2008. Tr. at 51. The ALJ issued an unfavorable decision on November 18, 2008, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 150–161. On June 29, 2010, the Appeals Council remanded the case to the ALJ under the substantial evidence, error of law, and new and material evidence provisions of 20 C.F.R. §§ 404.970 and 416.1470. Tr. at 162–65. On April 19, 2011, Plaintiff had a hearing before ALJ Roseanne P. Gudzan. Tr. at 63–93. (Hr'g Tr.). Plaintiff's attorney moved to amend Plaintiff's alleged onset date of disability to June 30, 2010. Tr. at 170. The ALJ issued a fully favorable decision on June 9, 2011, finding that Plaintiff had been under a disability since June 30, 2010, and that her substance use disorder was not a contributing factor material to the determination of disability. Tr. at 166–76. Under the authority of 20 C.F.R. §§ 404.977 and 416.1474, the Appeals Council vacated the hearing decision and remanded the case for further proceedings. Tr. at 177–82. On May 15, 2012, Plaintiff had a second hearing before ALJ Gudzan. Tr. at 94–145. (Hr'g Tr.). The ALJ issued an unfavorable decision on July 12, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 16–

37. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 17, 2013. [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 33 years old at the time of the most recent hearing. Tr. at 99. She completed high school, but was enrolled in resource classes and received a certificate of completion instead of a diploma. *Id.* Her past relevant work ("PRW") was as a nurse assistant. Tr. at 141. She alleges she has been unable to work since June 30, 2010. Tr. at 19.

2.    Medical History

Plaintiff presented to Bon Secours St. Francis on August 20, 2010, and complained that her lips were swelling and that she was short of breath. Tr. at 912. Phillip Warr, M.D., concluded that Plaintiff was having an acute allergic reaction to Bactrim. *Id.* Plaintiff informed Dr. Warr that she had been diagnosed with bipolar disorder, but that she was not taking medication. Tr. at 913. Dr. Warr advised Plaintiff that the Prednisone that he prescribed for treatment of the allergic reaction could induce a manic episode. *Id.*

On August 25, 2010, Plaintiff presented for urine drug screen, which was negative for all substances. Tr. at 1017.

On October 4, 2010, Plaintiff presented to Ryan Byrne, M.D., for treatment of depression and anxiety. Tr. at 941. Plaintiff reported poor sleep, variable appetite, periods of tearfulness, and low energy. *Id.* She reported a history of alcohol and cocaine abuse, but indicated that she had not abused substances since June. *Id.* Dr. Byrne assessed depression and alcohol abuse and cocaine dependence in early full remission. *Id.* Plaintiff's affect was restricted and her mood was sad. *Id.* Her thought process was linear and organized, without indication of psychosis. *Id.* She reported no suicidal or homicidal ideations or hallucinations. *Id.* Her insight and judgment were fair. *Id.*

On October 12, 2010, Plaintiff tested negative for all substances. Tr. at 1018.

On November 14, 2010, Plaintiff was admitted to Medical University of South Carolina ("MUSC") following a sexual assault. Tr. at 921. Plaintiff sustained physical injuries and was diagnosed with left ulnar fracture. Tr. at 923.

Plaintiff followed up with Dr. Byrne on January 10, 2011. Tr. at 942. Plaintiff reported that her mood was up and down and that she was experiencing some hopelessness. *Id.* She reported that she had completed a substance abuse class and that she remained sober from alcohol and drugs. *Id.* She indicated that she was experiencing intrusive thoughts, nightmares, hypervigilance, fear of leaving the house, and poor sleep. *Id.* Dr. Byrne noted that Plaintiff's affect was tearful at times, but that her thought process was linear and organized, without evidence of psychosis. *Id.* He indicated that Plaintiff endorsed no suicidal or homicidal thoughts, but that her insight and judgment were impaired. *Id.* Dr. Byrne added a diagnosis of PTSD. *Id.*

On March 21, 2011, Plaintiff presented to Dr. Byrne for follow up.  Tr. at 943.  Plaintiff reported that her mood had worsened because she ran out of Remeron.  *Id.*  She also indicated that she had recently binged on alcohol.  *Id.*  She reported significant PTSD symptoms, including nightmares, hypervigilance, being easily startled, avoiding discussion of her assault, and avoiding being alone in public.  *Id.*  Plaintiff's affect was somewhat anxious.  *Id.*  Her thought process was linear and organized, without evidence of psychosis.  *Id.*  Her insight and judgment were fair, and she denied suicidal or homicidal ideations and hallucinations.  *Id.*

On April 3, 2011, Alicia R. Murphy, a clinical counselor, wrote a letter indicating that Plaintiff had completed services and had been discharged from the substance abuse treatment program.  Tr. at 1019.  Ms. Murphy further indicated in her letter that all urine drug screens and breathalyzer results were negative.  *Id.*  Ms. Murphy indicated that Plaintiff reported to her that she drank alcohol on two occasions, both prior to November 2010.  *Id.*

Plaintiff followed up with Dr. Byrne on April 25, 2011.  Tr. at 944.  Plaintiff reported improved mood, but some difficulty controlling her anger.  *Id.*  She also endorsed low energy, poor concentration, increased appetite, and avoidance of large groups.  *Id.*  Dr. Byrne observed Plaintiff to have sad affect; linear and organized thought process; no suicidal or homicidal ideations; no hallucinations; and fair insight and judgment.  *Id.*

On May 16, 2011, Plaintiff presented to Harry P. Rudolph, IV, M.D., complaining of left forearm pain.  Tr. at 960.  X-rays indicated a significant hypertrophic non-union of

the ulna. *Id.* Dr. Rudolph discussed treatment options with Plaintiff and indicated that Plaintiff had chosen to proceed with open reduction internal fixation with small fragment fixation. *Id.*

On May 23, 2011, Plaintiff followed up with Dr. Byrne. Tr. at 956. Plaintiff reported increased frustration and hopelessness. *Id.* She reported decreased nightmares, but indicated that she was experiencing hypervigilance and that she had visual hallucinations of shadows. *Id.* Dr. Byrne indicated that Plaintiff's mood was more depressed and that her affect was anxious. *Id.* He indicated that her thought process was overall linear without evidence of psychosis. *Id.* Plaintiff reported no suicidal or homicidal thoughts, but Dr. Byrne indicated that her insight and judgment were impaired. *Id.*

On May 28, 2011, Plaintiff presented to MUSC, complaining of arm pain. Tr. at 949. No specific source for the pain was identified. *Id.*

On June 27, 2011, Plaintiff reported to Dr. Byrne that her mood was "alright." Tr. at 957. She denied suicidal and homicidal thoughts, but reported persistent nightmares. *Id.* Dr. Byrne reported that her affect was bright; that her thought process was linear and organized; and that her insight and judgment were fair. *Id.*

Plaintiff followed up with Dr. Byrne on July 25, 2011. Tr. at 958. Plaintiff reported minimal nightmares, good sleep, and improved mood. *Id.* She indicated that she was still afraid to leave her house at night. *Id.* She reported that she was going to the employment office daily to look for jobs. *Id.* Dr. Byrne noted that Plaintiff's affect was bright; that her mood was less depressed; that her thought process was clear and

organized; that she denied suicidal and homicidal thoughts; that her insight was fair; and that her judgment was good. *Id.*

On August 22, 2011, Plaintiff reported increased depression and anxiety to Dr. Byrne. Tr. at 959. Plaintiff reported increased stressors, including the need to testify against her attacker, a recent threat from her attacker, and a new man courting her. *Id.* She reported sleep disturbance, increased nightmares, and decreased motivation. *Id.* Dr. Byrne described Plaintiff's affect as sad and anxious. *Id.* Dr. Byrne noted that Plaintiff's insight and judgment were impaired, but that her thought process was linear and organized and that she reported no suicidal or homicidal ideations. *Id.*

On September 26, 2011, Plaintiff reported to Dr. Byrne that she was experiencing increased depression and passive suicidal thoughts after beginning therapy. Tr. at 976. Plaintiff's affect was constricted and her mood was depressed. *Id.* Her thought process was linear and organized. *Id.* Plaintiff demonstrated no evidence of psychosis and denied hallucinations. *Id.* Plaintiff's insight and judgment were fair. *Id.*

On October 8, 2011, Plaintiff presented to Roper Hospital with a panic attack. Tr. at 961.

Plaintiff followed up with Dr. Byrne on October 24, 2011. Tr. at 977. Plaintiff reported a history of sexual abuse perpetrated by two uncles. *Id.* She complained of severe anxiety and poor sleep. *Id.* Plaintiff denied suicidal ideations, homicidal ideations, and hallucinations. *Id.* Dr. Byrne indicated that Plaintiff's thought process was linear and organized and that her insight and judgment were fair. *Id.*

Plaintiff presented to MUSC on November 14, 2011, complaining of pain and suicidal ideation. Tr. at 979–84. She reported symptoms including poor appetite; loss of interest in pleasurable activities; sleep disturbance; decreased attention span; episodes of tearfulness or crying; and pessimistic attitude to the future. Tr. at 979. Plaintiff denied recent suicide attempt and active alcohol or drug abuse. *Id.* Alcohol and drug screens were negative. Tr. at 983. Plaintiff was hospitalized at MUSC's Institute of Psychiatry from November 14–18, 2011. Tr. at 985.

Plaintiff presented to MUSC's Institute of Psychiatry for psychological evaluation on November 22, 2011. Tr. at 1092–93. Plaintiff reported symptoms of PTSD including re-experiencing, avoidance, and hyperarousal. Tr.at 1093. Plaintiff also reported symptoms of depression including depressed mood, anhedonia, appetite disturbance, fatigue/loss of energy, sleep disturbance, isolative behaviors, psychomotor agitation, psychomotor retardation, worthlessness/guilt, difficulty concentrating, and indecisiveness. *Id.* Plaintiff reported having panic attacks at least three times per week and being afraid to leave her home without having someone accompany her. *Id.*

On November 28, 2011, Plaintiff presented to MUSC's Institute of Psychiatry for outpatient initial evaluation. Tr. at 996–97. Plaintiff indicated that her depression and mood had improved, but that she continued to experience anxiety. Tr. at 996.

Plaintiff followed up with Dr. Rudolph on December 1, 2011, and complained of continued pain in her left ulna. Tr. at 978. Dr. Rudolph indicated that Plaintiff likely had reflex sympathetic dystrophy. *Id.* Dr. Rudolph noted that Plaintiff had full range of motion to her elbow. *Id.* However, he also indicated that Plaintiff lacked about ten

degrees of supination to her forearm. Dr. Rudolph assessed a five percent impairment rating to Plaintiff's left arm. *Id.*

Plaintiff followed up with Lauren Yarrow, M.D., at MUSC's Institute of Psychiatry on December 12, 2011. Tr. at 998–99. Dr. Yarrow indicated that Plaintiff's energy was fair; that her thought process was linear; that her thought content was appropriate; that her interactions were isolated; that she was experiencing anhedonia; that she had some insight; that her judgment was fair; that her mood was depressed; and that her affect was anxious. Tr. at 998. Dr. Yarrow assessed a Global Assessment of Functioning ("GAF")[1] score of 55. Tr. at 999.

Plaintiff presented to Melissa Milanak for counseling on December 19, 2011. Tr. at 1000–02. Plaintiff endorsed symptoms of depression including low mood, low energy, frequent crying spells, and increased appetite. Tr. at 1001. Ms. Milanak described Plaintiff's energy as fair; her concentration as poor; her thought process as logical and linear; and her thought content as appropriate. *Id.* Plaintiff indicated to Ms. Milanak that she had difficulty completing tasks at work because of intrusive thoughts about her children and about abuse that she experienced in the past. *Id.* Plaintiff was tearful throughout the session. Tr. at 1002.

On January 25, 2012, Plaintiff presented to Cashton Spivey, Ph.D., for a psychological consultative evaluation. Tr. at 968–71. Plaintiff scored 23 out of a

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

possible 30 points on the Mini-Mental State Examination ("MMSE"), which suggested cognitive difficulties. Tr. at 970. Plaintiff's test performance also suggested impairment to short-term auditory memory functioning and poor abstract reasoning abilities. *Id.* Dr. Spivey indicated that Plaintiff had intact language skills and was capable of following a three-step command and accurately reproducing a drawing. *Id.* Dr. Spivey indicated that Plaintiff's general fund of information; insight; judgment; and attention/concentration were fair. *Id.* He indicated that Plaintiff's mood was mildly sad and that her affect was blunted. *Id.* Dr. Spivey indicated that Plaintiff may have difficulty managing her funds because of inability to perform serial 7s and may have difficulty understanding complex instructions and performing complex tasks because of borderline intelligence. Tr. at 971. Dr. Spivey completed a medical source statement. Tr. at 965–67. He indicated that Plaintiff had mild impairment with respect to the following: understand and remember simple instructions; carry out simple instructions; the ability to make judgments on simple work-related decisions; interact appropriately with the public; interact appropriately with supervisors; and interact appropriately with co-workers. Tr. at 965–66. Dr. Spivey indicated that Plaintiff had moderate limitations with respect to the following: understand and remember complex instructions; carry out complex instructions; make judgments on complex work-related decisions; and respond appropriately to usual work situations and to changes in a routine work setting. *Id.* Dr. Spivey indicated that Plaintiff's general intelligence likely fell in the borderline range. *Id.* Dr. Spivey indicated that Plaintiff had PTSD and mood swings secondary to bipolar

disorder.  Tr. at 966.  He wrote that "[i]ssues of ETOH/cocaine dependence do not appear to contribute to claimant's current limitations."  *Id.*

On March 5, 2012, Plaintiff presented to MUSC's Pain Management Clinic for initial visit.  Tr. at 1023–24.  Plaintiff complained of chronic pain in her neck, shoulder, upper back, lower back, and leg.  Tr. at 1023.  She also complained of swelling, chest pain, shortness of breath, and sleep disturbance.  *Id.*  Steven Gibert, M.D., indicated that he suspected fibromyalgia and sleep apnea.  Tr. at 1024.

On March 13, 2012, Plaintiff presented to Dr. Yarrow for follow up.  Tr. at 1061.  Dr. Yarrow noted that Plaintiff was sitting in the waiting room crying and indicating that she could not go on.  *Id.*  Dr. Yarrow recommended hospitalization, but Plaintiff refused.  *Id.*  When Dr. Yarrow insisted on hospitalization, Plaintiff threatened to become violent and left the building.  *Id.*  Plaintiff was apprehended by security and taken to the hospital, where she was involuntarily committed.  *Id.*

Plaintiff was hospitalized at MUSC's Institute of Psychiatry from March 13–19, 2012, for suicidal thoughts.  Tr. at 1036–85.  Plaintiff reported decreased appetite, low energy, little concentration, and poor sleep.  Tr. at 1036.  Plaintiff's medication was adjusted, and Plaintiff was discharged with a GAF score of 55.  Tr. at 1037.

On March 25, 2012, Plaintiff followed up with Dr. Yarrow.  Tr. at 1086–88.  Plaintiff was calm, alert, and fully oriented.  Tr. at 1087.  *Id.*  She apologized for her behavior at the earlier visit and indicated that she had been upset because she discovered that her five-year-old was being physically abused by a relative.  Tr.at 1086.  Dr. Yarrow assessed a GAF score of 55.  Tr. at 1087.

Plaintiff tested negative for the five major classes of drugs on April 3, 2012. Tr. at 1033.

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

            a.    Plaintiff's Testimony

                i.    Hearing on October 15, 2008

At the hearing on October 15, 2008, Plaintiff testified that she was fired in January 2007 and that she collected unemployment in 2007 and 2008. Tr. at 50–51. Plaintiff testified that she had four children, ages thirteen, eight, five, and two. Tr. at 51–52. Plaintiff testified that she received SSI benefits for three of her children. Tr. at 52. Plaintiff testified that she received a certificate after completing the twelfth grade and that she was enrolled in resource classes for reading. Tr. at 54. She indicated that she obtained a certified nursing assistant ("CNA") certificate through Job Corp. *Id.* Plaintiff testified that she performed past work as a CNA. Tr. at 55.

Plaintiff testified that she was diagnosed with bipolar disorder in 2006, when she was ordered by the court in a DSS case to obtain mental health treatment. Tr. at 56. Plaintiff testified that she experienced symptoms including crying spells, feelings of worthlessness, impaired interest, feelings of hopelessness, suicidal thoughts, and impaired concentration. Tr. at 58–59. Plaintiff testified that she experienced mood swings and twitching. Tr. at 60. She indicated that she did not like to go outside and preferred to stay in the house. *Id.* She testified that she last used cocaine in 2006. Tr. at 61. However, after the ALJ mentioned a 2008 record that indicated Plaintiff had used

cocaine, Plaintiff indicated that she last used cocaine in March 2008. Tr. at 61–62. Plaintiff testified that she last used alcohol in January 2008. Tr. at 62.

ii.    Hearing on April 19, 2011

At the hearing on April 19, 2011, Plaintiff testified that she worked in 2009, but that she was fired from her job in January 2010 because she went to jail for a gun charge. Tr. at 70–71. Plaintiff testified that she collected unemployment after being fired from her job and that she was continuing to collect unemployment. Tr. at 71.

Plaintiff testified that she injured her left arm when she was kidnapped and beaten in November 2010. Tr. at 72–73. She indicated that she had problems with depression and staying focused. Tr. at 74.

Plaintiff testified that she completed a treatment program for drugs and alcohol in November 2010 and that she was no longer using drugs and alcohol. Tr. at 74. Plaintiff testified that she had used no drugs or alcohol since completing the program. Tr. at 75.

Plaintiff testified that her children were removed from her custody and that two were placed with relatives and the other two were in foster care. *Id.*

Plaintiff testified that she sustained a back injury when a patient fell on her in 2005, but that she had not had back surgery. Tr. at 78. Plaintiff testified that she had problems working with co-workers. *Id.* She indicated that she had been fired from multiple jobs. Tr. at 79. Plaintiff testified that she had become so angry with a co-worked that she drove her car into a wall. *Id.* Plaintiff testified that she had PTSD because she was raped by an uncle at a young age. Tr. at 80. She also testified that she was beaten by multiple men with whom she had relationships. Tr. at 80–81.

Plaintiff testified that she had been hospitalized four times over the prior five-year period for mental impairments.  Tr. at 82.  She testified that she once attempted suicide by slicing her arm with a razor.  *Id.*  Plaintiff described symptoms of mania, including feeling on top of the world, not sleeping, and buying things with money she could not afford to spend.  Tr. at 82–83.  Plaintiff endorsed symptoms including crying spells, sleep disturbance, impaired ability to maintain interest, appetite disturbance, feelings of worthlessness, helplessness, panic attacks, impaired memory, avoidance of others, avoidance of social activities, and isolation.  Tr. at 83–85.

Plaintiff testified that she usually sat at a bus stop or at a friend's house during the day.  Tr. at 87–88.  Plaintiff testified that she had recently been released from jail.  Tr. at 89.

### iii.    Hearing on May 15, 2012

At the hearing on May 15, 2012, Plaintiff testified that she was able to read and write a simple list.  Tr. at 99.  She testified that her driver's license was suspended for reckless driving.  *Id.*  Plaintiff indicated that she traveled by bus when she needed to pick up items from a store and in order to attend daily AA meetings.  Tr. at 100, 104, 107.

Plaintiff testified that she was 5'1" tall and weighed 285 pounds.  Tr. at 101.  She indicated that she was receiving regular mental health treatment through MUSC and that she was taking her medications as prescribed.  Tr. at 103.  She stated that she had recently broken her left arm for the second time.  Tr. at 105.  She indicated that she had asthma, which was exacerbated by walking and running.  Tr. at 106.  Plaintiff testified that her

medications caused problems with "twitching, slurring, stuttering, and comprehension." Tr. at 107.

Plaintiff testified that she was unable to focus for long enough to read. Tr. at 107–08. Plaintiff testified that she had problems following instructions. Tr. at 111. She indicated that she had been fired from all of her past jobs. Tr. at 112. Plaintiff testified that she was unable to perform her past work as a CNA because she was unable to concentrate. *Id.*

Plaintiff testified that she was repeatedly sexually abused by two uncles as a child. Tr. at 112–13. Plaintiff testified that her ex-husband would lock her in the house and beat her. Tr. at 113.

Plaintiff testified that she was scared to go outside and that she had nightmares. Tr. at 114. She indicated that she was hospitalized twice in the past year and that she was most recently hospitalized for suicidal thoughts in March. Tr. at 115. She testified that she was taking her medications and that the medications helped, but did not completely control her symptoms. *Id.*

Plaintiff testified that she had crying spells, sleep disturbance, low energy, frustration, feelings of hopelessness, low self-esteem, little appetite, and little interest. Tr. at 115–17. Plaintiff testified that she had no friends. Tr. at 117. She testified that she had problems with her memory. *Id.*

Plaintiff testified that she received unemployment compensation until January 2012. Tr. at 119.

b.     Vocational Expert Testimony

i.     Hearing on April 19, 2011

Vocational Expert ("VE") Feryal Jubran reviewed the record and testified at the hearing. Tr. at 90–92. The VE categorized Plaintiff's PRW as a nursing assistant, Dictionary of Occupational Titles ("DOT) number 355.674-014, medium and semiskilled. Tr. at 91. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could not perform fast-paced production work; who could have occasional interaction with co-workers, supervisors, and the public; who could not work in coordination with others throughout the day, but who could work in proximity to others throughout the work day; and who was limited to performing simple, routine, repetitive tasks. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's past relevant work. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified jobs that the hypothetical individual could perform, including that of cleaner, DOT number 381.687-014, medium and skilled with 68,000 in South Carolina and 3,423,000 in the United States; warehouse worker, DOT number 922.687-058, medium and unskilled with 36,200 in South Carolina and 2,220,000 in the United States; and tagger, DOT number 369.687-026 with 2,520 in South Carolina and 236,000 in the United States. Tr. at 91–92. The ALJ added to her first hypothetical additional restrictions that included the following:  lift, carry, push and/or pull 50 pounds occasionally and 25 pounds frequently; sit six hours and stand and walk a total of six hours out of an eight-hour workday with normal breaks; frequently perform postural

16

activities except do no climbing of ladders, ropes, or scaffolds, crawling, or balancing; and avoid hazards such as unprotected heights or dangerous moving machinery. The VE indicated that the jobs identified in response to the first hypothetical could be performed with the additional limitations. Tr. at 92. The ALJ asked the VE if a hypothetical individual of the Plaintiff's age, education, and PRW could do any jobs if that person were unable to perform work at any level of exertion, secondary to interruption from psychologically-based symptoms. *Id.* The VE responded that there would be no jobs in significant numbers that such an individual could perform. *Id.*

ii.     Hearing on May 15, 2012

Vocational Expert Marcia Schulman reviewed the record and testified at the hearing. Tr. at 141–44.

The VE testified that Plaintiff's past work was that of a nursing assistant, DOT number 355.674-014, which was medium and semiskilled with a SVP of 4. Tr. at 141.

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education and past work, with the following limitations: could lift, carry, push, and pull with all but the left upper extremity, 20 pounds occasionally and 10 pounds frequently; should not pull with the left upper extremity; could sit six hours and stand and/or walk a total of six hours out of an eight-hour day with normal breaks; could frequently climb, ramps and stairs, stoop, kneel, and crouch; could never climb ladders, ropes, or scaffolds; could never balance for safety, such as on dangerous or slippery surfaces; could never crawl; could occasionally reach overhead; could frequently reach out with the left upper extremity; had no limits on the use of the right dominant upper extremity; should not

17

have concentrated exposure to respiratory irritants such as fumes, odors, dust, gases, and poor ventilation; should not work around hazards such as unprotected heights or dangerous moving machinery; could understand, remember, and carry out simple, unskilled, repetitive tasks for two hours at a time; could not perform fast-paced production rate work or work requiring close supervision; and could occasionally interact with coworkers, supervisors, and the public. Tr. at 142.

The ALJ asked if the hypothetical individual could perform Plaintiff's PRW. *Id.* The VE testified that this hypothetical individual could not perform Plaintiff's PRW. *Id.*

The ALJ asked if there were other jobs this hypothetical individual could perform. Tr. at 143. The VE identified light and unskilled jobs as assembler, DOT number 706.687-010, with 2,700 in South Carolina and 229,000 nationally; mail clerk, DOT number 209.687-026, with 1,400 in South Carolina and 119,000 nationally; and inspector/checker, DOT number 222.687-042, with 2,000 in South Carolina and 220,000 nationally. *Id.*

The ALJ asked the VE to assume the restrictions in the hypothetical, but to assume an additional restriction of an inability to maintain attention and concentration on work tasks for two hours at a time. *Id.* The VE testified that if "the inability was anything greater than a brief, short interruption period," the hypothetical individual would be unable to perform the identified jobs. *Id.*

Plaintiff's attorney asked the VE if absences more than three days per month or a need for excessive breaks would allow the hypothetical individual to maintain a job. Tr. at 144. The VE testified that it would not, if it were a consistent pattern. *Id.*

c.    Medical Expert Testimony

At the hearing on May 15, 2012, Medical Expert ("ME") Olin Hamrick, M.D., reviewed the record and testified.  Tr. at 123–39.  The ME testified that he believed Listings 12.04, 12.06, and 12.09 were relevant.  Tr. at 123.  He testified that Plaintiff had diagnoses considered under Listing 12.04 of depressive disorder not otherwise specified, major depressive disorder, and bipolar disorder.  *Id.*  He indicated that Plaintiff's diagnosis of PTSD should be considered under Listing 12.06, and that poly-substance abuse and history of dependence should be considered under Listing 12.09.  *Id.*  The ME testified that there was no evidence in the record of any long-term abstinence from substance abuse.  Tr. at 124.    He indicated that all of Plaintiff's hospitalizations have indicated that they were in the context of alcohol or cocaine abuse.  *Id.*  He also testified that, while Plaintiff's functioning at those times was markedly impaired in terms of social functioning and concentration, persistence, and pace, Plaintiff had no more than moderate limitations in these areas outside the context of intoxication or acute withdrawal.  *Id.*

The ME indicated that Plaintiff had no more than moderate limitations in dealing with complex instructions and handling work stresses and changes.  Tr. at 125.  He also indicated that he would include a limitation of only occasional contact with the public.  *Id.*

The ME testified that Plaintiff had no episodes of decompensation of extended duration.  Tr. at 126.  He indicated that Plaintiff had some episodes of decompensation, but they were brief and were in the context of substance abuse.  *Id.*

The ME testified that the record contained no evidence that Plaintiff had ever been in any kind of long-term structured treatment program or that she had ever been in any monitored housing program that involved any kind of mental health monitoring or assessment or treatment. *Id.*

The ME testified that Plaintiff would be able to adapt to routine work settings, but that she would not be a candidate for any kind of fast paced production line type activity that involved close monitoring. Tr. at 126–27. He also indicated that Plaintiff could have no more than occasional supervision of routine work. Tr. at 127. The ME testified that, without substance abuse, Plaintiff could sustain attention on simple work task for up to two hours at a time. *Id.* He testified that Plaintiff would be limited to simple, unskilled, routine, repetitive work. *Id.*

The ALJ asked the ME if evidence of negative drug testing going back to June 30, 2010, would change his opinion. Tr. at 135. The ME indicated that it would not because Plaintiff's reports of daily activities and her assessment with Dr. Spivey did not indicate more than moderate limitations. Tr. at 136.

2.    The ALJ's Findings

In her decision dated July 12, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act through December 31, 2011.
2.    The claimant has not engaged in substantial gainful activity since June 30, 2010, the alleged onset date. 20 C.F.R. §§ 404.1520(b), 404. 1571 *et seq.*, 416.920(b) and 416.971 *et seq.*
3.    The claimant has the following severe impairments:  status post left ulnar fracture; obesity; L5-S1 facet arthropathies; fibromyalgia; asthma; depressive disorder, not otherwise specified ("NOS"); major depressive

disorder; bipolar disorder; post traumatic stress disorder; anxiety disorder; and drug and alcohol abuse ("DAA"). 20 C.F.R. §§ 404.1520(c) and 416.920(c).

4. The claimant's impairments, including the substance use disorders, meet sections 12.04, 12.06, and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d) and 416.920(d)).

5. If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

6. If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medially equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (20 C.F.R. §§ 404.1520(d) and 416.920(d)).

7. If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). Specifically, the claimant can lift, carry, push and/or pull, with all but the left upper extremity, 20 pounds occasionally and 10 pounds frequently. The claimant should not push or pull with the left upper extremity. She can sit for six hours and stand and/or walk for a total of six hours in an eight-hour work day with normal breaks. She can frequently climb ramps and stairs, stoop, kneel, and crouch; however, she can never climb ladders, ropes or scaffolds, balance for safety, such as on dangerous or slippery surfaces, or crawl. The claimant can occasionally reach overhead and frequently reach out with the left upper extremity. She has no limits on the use of the dominant right upper extremity. The claimant can frequently handle and finger with the left upper extremity, but she has no limits on the right upper extremity. She must avoid concentrated exposure to respiratory irritants, such as fumes, dusts, odors, gases, and poor ventilation. She must not work around hazards, such as dangerous moving machinery and unprotected heights. The claimant can understand, remember, and carry out simple, unskilled repetitive tasks for two hours at a time. She cannot perform fast-paced production rate work or work requiring close supervision. She can occasionally interact with co-workers, supervisors, and the public.

8. If the claimant stopped the substance use, the claimant would be unable to perform past relevant work. 20 C.F.R. §§ 404.1565 and 416.965.

9. The claimant was born on September 17, 1978, and was 31 years old, which is defined as a younger individual age 18–49, on the amended alleged onset date. 20 C.F.R. §§ 404.1563 and 416.963.

10. The claimant has at least a high school education and is able to communicate in English. 20 C.F.R. §§ 404.1654 and 426.964.

11. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2.

12.    If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform.  20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), and 416.966.

13.    The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if she stopped the substance use.  20 C.F.R. §§ 404.1520(g), 404.1535, 416.920(g), and 416.935.  Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

Tr. at 16–46.

D.    Appeals Council Review

On November 13, 2012, The Appeals Council issued a notice denying Plaintiff's request for review.  Tr. at 1–3.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ's decision is not supported by substantial evidence; and

2)    The ALJ's decision is contrary to opinion evidence from Plaintiff's treating physicians, Dr. Diaz and Dr. Yarrow.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v.*

---

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

        1.    Substantial Evidence

Plaintiff argues that the record contains overwhelming evidence of both physical and mental disability. [Entry #39 at 1]. The Commissioner counters that substantial evidence supports the ALJ's decision. [Entry #43].

"In evaluating whether or not the ALJ's ultimate conclusion is supported by substantial evidence, this court can do no more than require that the ALJ carefully consider the evidence, make reasonable and supportable choices[,] and explain his conclusions." *McCall v. Apfel*, 27 F. Supp. 2d 723, 731 (S.D.W.Va. 1999). "[T]he Commissioner, not the court, is charged with resolving conflicts in the evidence." *Belcher v. Apfel*, 56 F. Supp. 2d 662, 665 (S.D.W.Va. 1999). However, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 56 F. Supp. 2d at 665 citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

Where the record contains medical evidence of drug addiction or alcoholism, the ALJ must perform a secondary analysis. *See Newsome v. Astrue*, 817 F. Supp. 2d 111, 126 (E.D.N.Y. 2011). An individual is not considered disabled under the Social Security Act "if alcoholism or drug addiction would be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.A. § 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535(a), 416.935(a). Where there is medical evidence

of drug addiction or alcoholism, the key factor is "whether we could still find you disabled if you stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). In order to make that determination, the ALJ must evaluate which physical and mental limitations would remain if drug addiction or alcoholism ceased, and then determine whether the remaining limitations would be disabling. *See* 20 C.F.R. § 404.1535(b)(2), 416.935(b)(2). If the medical evidence contains indications of drug addiction or alcoholism, "[t]he claimant bears the burden of proving that drug or alcohol addiction was not a contributing factor material to the disability determination." 817 F. Supp. 2d at 126. *See also White v. Comm'r of Soc. Sec.*, 302 F. Supp. 2d 170, 173 (W.D.N.Y. 2004); *accord Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); *Doughty v. Apfel*, 245 F.3d 1274, 1280 (11th Cir. 2011); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).

The ALJ determined that Plaintiff was disabled under Listings 12.04, 12.06, and 12.09, but that, if Plaintiff abstained from alcohol and drug abuse, her impairments would not meet the Listings, and she would be able to engage in substantial gainful work activity. Tr. at 16–46.

The ALJ concluded that claimant's impairments, including the substance use disorders, met sections 12.04, 12.06 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d) and 416.920(d)). Tr. at 23. In reaching this conclusion, the ALJ discussed Plaintiff's symptoms under the paragraph A criteria of Listings 12.04 and 12.06. *Id.* The ALJ also concluded that "the claimant meets Listing 12.09, as the record shows evidence of behavioral changes or physical changes associated

27

with the regular use of substances that affect the central nervous system." *Id.* With respect to the paragraph B criteria under Listings 12.04 and 12.06, the ALJ concluded that Plaintiff demonstrated marked restriction of activities of daily living during periods of substance abuse and withdrawal; that Plaintiff had marked difficulties in social functioning during periods of substance abuse and withdrawal; that Plaintiff had marked difficulties with regard to concentration, persistence, or pace during periods of substance abuse and withdrawal; and that Plaintiff had not experienced any episodes of decompensation of extended duration. *Id.*

The ALJ made specific findings to support her conclusion that Plaintiff's periods of symptom exacerbation were tied to substance abuse relapses. The ALJ indicated that in March 2011, Plaintiff binged on alcohol, which was documented in her treating psychiatrist's notes. Tr. at 24. The ALJ cited a report from Charleston Center, which indicated Plaintiff had two incidents in which she used alcohol prior to November 2010.[4] *Id.* While the ALJ acknowledged that the treatment notes from Plaintiff's symptom exacerbation in May 2011 did not provide evidence of polysubstance abuse, the ALJ indicated that in November 2011, Plaintiff indicated that she last used alcohol in May 2011. *Id.* The ALJ noted that records from Plaintiff's November 2011 hospitalization indicate a diagnosis of "polysubstance abuse in remission," and that Plaintiff's GAF

---

[4] While the ALJ suggests that Plaintiff's presentation to the emergency room for panic attack was connected to a period of relapse prior to November 2010, the undersigned's review of the record reveals that Plaintiff presented to the emergency room at Roper Hospital on October 8, 2011, which was approximately six months after the letter referring to the relapses was written. Therefore, Plaintiff's presentation to the emergency room for panic attack cannot logically be tied to the documented relapses prior to November 2010.

score improved substantially "[a]fter four days of treatment and abstinence from polysubstance abuse."[5]   *Id.*   The ALJ also notes that the discharge summary from Plaintiff's March 2012 hospitalization indicates diagnoses of benzodiazepine abuse and opioid abuse.  *Id.*

The undersigned finds that the ALJ considered the evidence regarding Plaintiff's substance abuse, made a reasonable and supportable choice, and explained her conclusion.  Although the claimant submitted evidence to suggest she was abstaining from substance abuse, including proof of completion of the program through Charleston Center, proof of AA meeting attendance, and negative alcohol and drug screens, the undersigned is constrained to defer to the ALJ's determination regarding the presence and effects of substance abuse.  While the undersigned might have resolved conflicts in the evidence regarding the continuation of Plaintiff's substance abuse differently, the undersigned must uphold the decision of the ALJ where the ALJ weighed the evidence and reached a rational conclusion.

The undersigned also finds that the ALJ's conclusions regarding Plaintiff's RFC and ability to engage in work activity were supported by substantial evidence in the record and adequately explained in her decision.  The ALJ considered Plaintiff's testimony, records from Plaintiff's medical treatment, and the report from the consultative examination.  The ALJ cited Plaintiff's testimony regarding her daily activities, and concluded that they were inconsistent with her allegations of disabling

---

[5] The undersigned notes that the medical records from Plaintiff's November 14–18, 2011, hospitalization indicate that Plaintiff tested negative for drugs and alcohol upon admission. Tr. at 983.

functional limitations.  Tr. at 32.  The ALJ discussed the January 2012 consultative examination with Dr. Spivey, and concluded that Dr. Spivey's observations were consistent with the ALJ's finding that Plaintiff had moderate limitation to social and occupational functioning.  Tr. at 30–31.  The ALJ found that the objective records regarding Plaintiff's ulnar fracture and the assessment by her treating physician did not support the degree of limitation alleged by Plaintiff.  Tr. at 31.  The ALJ discussed specific mental health treatment records and indicated that they supported her finding.  Tr. at 30–33.  The ALJ noted that Plaintiff's treating psychiatrist had assessed GAF scores of 55.  Tr. at 30–31.  In *Parker v. Astrue*, the court cited to the DSM-IV's description of several ranges of GAF, as follows:

> A GAF score of 51–61 indicates moderate symptoms (e.g., circumstantial speech and occasional panic attacks) or moderate difficulty in social or occupational functioning (e.g., no friends, unable to keep a job). A GAF score of 61–70 is less severe and indicates only that a person has "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally function[s] pretty well, [and] has some meaningful interpersonal relationships." Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

664 F. Supp. 2d at 549 n.3.  The ALJ adequately concluded that the GAF scores of 55 indicated moderate limitations.

The ALJ also properly considered evidence that Plaintiff collected unemployment compensation through January 2012.  Tr. at 33.  "While receiving unemployment benefits may not *always* preclude a finding of disability, it is among the many factors that may well support a determination that a claimant is not credible, inasmuch as representing to a state employment agency that one is able to work is usually inconsistent with a claim of

disability." *Clark v. Astrue*, 2012 WL 6728441 at *3 (W.D.N.C. 2012) (emphasis in original); *see Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (finding "claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work" is a factor that may be considered in determining credibility); *see also Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998) (holding that "the acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability"). The ALJ noted that, in order to receive unemployment benefits, Plaintiff had to certify that she was able to work, was available for full-time work, was willing to accept suitable work if offered, and was actively seeking full-time work each week. Tr. at 33. The ALJ properly considered Plaintiff's receipt of unemployment compensation and the certifications that she made to a state agency to receive those benefits as one of many factors in assessing Plaintiff's credibility.

The undersigned finds that the ALJ properly considered and rejected the opinion of Plaintiff's treating physician Alexander Chessman, M.D. In July 2008, Dr. Chessman indicated that Plaintiff was permanently disabled and that Plaintiff could sit for two hours per workday; stand for two hours per workday; walk for two hours per workday; climb stairs/ladders for two hours per workday; kneel/squat for four hours per workday; bend/stoop for six hours per workday; push/pull for eight hours per workday; keyboard for eight hours per workday; and lift/carry for eight hours per workday. Tr. at 824–25. Dr. Chessman did not allude to any specific findings to support the indicated restrictions. If a treating source's medical opinion is "well-supported and not inconsistent with the

other substantial evidence in the case record, it must be given controlling weight[.]"  SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).  The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence."  *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001).  The ALJ indicated that she gave limited weight to Dr. Chessman's opinion because it was rendered nearly two years before Plaintiff's alleged onset date and because Plaintiff engaged in full-time work for a significant period after it was rendered.  Tr. at 25.  The undersigned finds that the ALJ gave sufficient reasons for rejecting Dr. Chessman's opinion in that his opinion was inconsistent with other substantial evidence closer to Plaintiff's alleged onset date.

The undersigned finds that the ALJ properly considered the opinions of the consultative psychologist and the ME.  The ALJ accorded great weight to Dr. Spivey's opinion and noted that his opinion was consistent with his examination of Plaintiff and with the other mental health evidence in the record.  Tr. at 34.  The ALJ also accorded great weight to the opinion of Dr. Hamrick that the claimant would only suffer from mild to moderate limitations in activities of daily living and moderate limitations in concentration, persistence, or pace if the claimant stopped engaging in substance abuse.

*Id.* The opinions of Drs. Spivey and Hamrick were consistent with each other and with the other medical evidence and the ALJ appropriately accorded them great weight.

The undersigned has scrutinized the record as a whole and concludes that the ALJ's conclusions are rational and are supported by substantial evidence.

### 2.    Treating Physicians' Opinions

Plaintiff argues that two of her most important treating sources have completed detailed medical source statements that suggest she would be precluded from work. [Entry #39 at 1]. Plaintiff submitted to this court a letter from Vanessa A. Diaz, M.D., dated June 21, 2013, which indicated Plaintiff's diagnoses and medications. [Entry #35]. Dr. Diaz also indicated that Plaintiff's functional abilities were limited. *Id.* Plaintiff argues that Dr. Diaz assessed specific limitations on Plaintiff's abilities to lift, carry, stand, walk, sit, and function mentally in a work setting. [Entry #39 at 3]. Plaintiff also submits that Dr. Yarrow assessed specific limitations. *Id.* at 4.

The Commissioner notes that the administrative record does not contain any opinions or residual functional capacity assessments from these physicians and that medical opinions solicited after the ALJ's decision should not be considered. [Entry #43 at 12].

"Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence." *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972). The District Court cannot consider evidence that was not submitted to the ALJ. *See Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

The undersigned's review of both the administrative record and the entries in this case reveals no specific limitations from Dr. Diaz, Dr. Yarrow, or any other physician, other than Dr. Chessman, whose opinion was correctly rejected by the ALJ.

The undersigned declines to consider the June 21, 2013, letter from Dr. Diaz or any other evidence alluded to, which does not appear in the administrative record. The undersigned further finds that the administrative record contains no treating physicians' opinions regarding Plaintiff's limitations during the relevant period.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

July 31, 2014                                    Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge